NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

---

**In the Matter of**

**Investigation by MARIA T. VULLO,**
**Superintendent of Financial Services, of**

**CONDUENT EDUCATION SERVICES, LLC, f/k/a**
**XEROX EDUCATION SERVICES, LLC, f/k/a and d/b/a**
**ACS EDUCATION SERVICES, INC.**

    **Respondent.**

---

### CONSENT ORDER

 **WHEREAS,** the New York Department of Financial Services ("DFS") commenced an investigation pursuant to New York Financial Services Law ("FSL") § 404 into whether Conduent Education Services, LLC, f/k/a Xerox Education Services, LLC, f/k/a and d/b/a ACS Education Services, Inc. ("ACS" or "Respondent") complied with the requirements of the FSL and other applicable laws and regulations, including the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5481 *et seq.* (the "CFPA"), in servicing federally-guaranteed and private student loans;

 **WHEREAS,** the Office of the Attorney General of the State of New York ("NYAG") commenced its own investigation pursuant to New York Executive Law § 63(12) and New York General Business Law § 349 into whether any person has engaged in repeated or persistent fraudulent, illegal or deceptive conduct in the servicing of federally-guaranteed student loans; and

 **WHEREAS,** this Consent Order (the "Consent Order") contains the findings of DFS's and the NYAG's investigations, and the relief agreed to by ACS. ACS and the NYAG are

1

entering into an Assurance of Discontinuance ("Assurance") regarding the subject matter of this Consent Order;

**NOW THEREFORE,** the Department and ACS are willing to resolve the matters cited herein in lieu of proceeding by notice and a hearing.

FINDINGS

The findings of the Department's investigation are as follows:

*Overview of the Parties and the Investigation*

1.    ACS is a Delaware limited liability company that contracts with various private owners of federally-guaranteed student loans issued under the Federal Family Education Loan Program, 20 U.S.C. § 1071 *et seq.* ("FFEL Loans") to provide servicing for those loans.  ACS also services private student loans.  As a loan servicer, ACS issues monthly bills and collects monthly payments, provides borrowers with information about their loans, and handles applications for various programs available to distressed borrowers.

2.    ACS has performed student loan servicing in various corporate forms.  Xerox Corporation acquired Affiliated Computer Services, Inc. in 2010 and engaged in a corporate reorganization.  While the resulting relevant subsidiary was eventually renamed Xerox Education Services, LLC, it continued to operate under the name "ACS."  In January 2017, Xerox Corporation spun off Xerox Education Services' parent company.  As a result, Xerox Education Services was renamed Conduent Education Services, LLC, and began to do business under that name in March 2017.

3.    ACS is a "covered person" as that term is defined in the CFPA, 12 U.S.C. § 5481(6), and is registered with the New York Department of State to do business within New York State.

*Steering Borrowers into Forbearance Instead of Income-Based Repayment*

4.     FFEL Loan borrowers who are struggling to make their monthly payments have a number of options available to them. Most importantly, since 2009, qualifying borrowers have been able to enter a program called "Income-Based Repayment" ("IBR"), which bases monthly payments on the borrower's income, family size, and total amount of student loan debt (for payments as low as $0/month) and provides that borrowers may be eligible for forgiveness of any remaining balance after 25 years. In addition, the federal government offers a three-year interest subsidy to qualifying IBR enrollees.

5.     Depending on their circumstances, FFEL Loan borrowers may also be eligible to enter into "forbearance," under which no payments are made for a certain period, with the unpaid amount usually added at the end of the period to the total due ("capitalization"). FFEL Loan borrowers may also be eligible to enter into a "deferment," which similarly allows no payments for a certain period, also sometimes resulting in capitalization. While forbearance or deferment may be appropriate during periods of short-term financial difficulties with a foreseeable end, they usually increase the amount the borrower must pay in the end, meaning that they are not appropriate solutions for borrowers whose income is simply not adequate to permit them to pay their monthly student loan payments.

6.     Because a borrower must qualify for IBR through an income-verification process, explaining the program to a borrower and assisting the borrower through the application process is relatively time consuming for ACS customer-service representatives. In contrast, arranging a period of forbearance for a borrower is ordinarily rapid and straightforward.

7.     ACS represented to borrowers that it would help them find a repayment plan that fits their needs. Despite this representation, prior to 2014, ACS's customer service representatives were not adequately trained in providing the information necessary to explain to

3

borrowers whether they would be eligible for IBR. ACS's proprietary training and procedure database, known as RoboHelp, directed ACS's representatives to refer borrowers to studentaid.ed.gov to determine for themselves whether they qualified for IBR. RoboHelp contained only a basic overview of IBR and information concerning the internal processing of IBR applications. It did not contain suggested responses to borrower concerns or inquiries. In the absence of sufficient guidance in RoboHelp, ACS's agents were unable to adequately explain IBR to borrowers.

8. For several years, ACS Customer Care, the group that responds to borrower inquiries, maintained an official "order of resolution," that is, the list of the order in which various options were offered to distressed borrowers who contacted ACS, which directed that forbearance be offered early on in the discussion—with IBR being offered only as the last resort before a borrower defaulted. As a result, a borrower who accepted a forbearance might never be informed of the potentially more beneficial option of IBR.

9. Representatives working in Collections, the group that contacted borrowers who were falling behind on monthly loan payments, were directed to tell borrowers at the end of calls that "all options have been used" even though IBR had not been not mentioned. Written communications to borrowers promoted forbearance and deferral, making only vague references to IBR.

10. ACS's website also failed to disclose material facts concerning IBR's benefits. The website failed to disclose that some borrowers would pay less each month in interest than what was accruing on their loans, and that the unpaid interest would not be added to the principal of the loans as long as they reapplied for the IBR plan each year and continued to meet reduced-payment eligibility requirements. The website also failed to disclose that the federal government

4

offered a three-year interest subsidy in connection with IBR plans under certain circumstances.

11.     Due to these misrepresentations and omissions, many borrowers who were unable to make their monthly payments were directed into forbearance when they would have benefited from entering into IBR.  This led to increased loan balances for already-struggling borrowers and cost them months of payments which could have counted towards IBR's 25-year forgiveness period.

### *Steering Borrowers into IBR (or Forbearance) instead of PAYE/REPAYE*

12.     Beginning in 2013, the federal government introduced new and more favorable repayment programs for student loan borrowers.  These programs—known as PAYE and REPAYE—offer lower monthly payments than IBR and forgiveness of any remaining balance at 20 instead of 25 years, in addition to other benefits.  PAYE and REPAYE are only available to borrowers in the Direct Loan program, which replaced FFEL.  However, FFEL Loan borrowers are ordinarily able to "consolidate" their already-existing FFEL Loans into the Direct Loan program and thereby become eligible for all benefits available to Direct Loan borrowers.

13.     Because ACS serviced only FFEL Loans after 2013, consolidating already-existing FFEL Loans into Direct Loans resulted in a loss of servicing business for ACS.

14.     RoboHelp lacked adequate information about the benefits of consolidation.  As a result, ACS's representatives were not able to accurately advise borrowers about the benefits of consolidating FFEL Loans into Direct Loans.  By failing to provide sufficient information about the potential benefits of loan consolidation, ACS steered borrowers away from loan consolidation.

15.     Furthermore, although ACS eventually modified ACS Customer Care's official "order of resolution" to direct Customer Care representatives to offer IBR prior to forbearance, the revised "order of resolution" failed even to mention PAYE or REPAYE.  Although

representatives were instructed to tell borrowers on the phone that they were working to identify the "most beneficial" options for the borrowers, representatives did not discuss or promote PAYE or REPAYE with them. Similarly, ACS's written communications describing "repayment options available to you" and ACS's website provided information about IBR, but failed even to mention PAYE or REPAYE.

16.     As a result, struggling borrowers were steered into IBR (or forbearance). This harmed them by forcing them to make higher monthly payments than required and requiring 25, rather than 20, years of repayment before the forgiveness of their remaining loan balances.

### *Misinforming Borrowers, Including Servicemembers, That They Are Ineligible for Public Service Loan Forgiveness*

17.     Another option for federal student loan borrowers is the Public Service Loan Forgiveness ("PSLF") Program, which was established in 2007. PSLF provides that borrowers who make 120 qualifying payments while working for qualifying public-service employers (including the military) may receive forgiveness of the remaining balance at the end of the period. As with PAYE and REPAYE, only Direct Loan borrowers are eligible for PSLF, but FFEL Loan borrowers may take advantage of the program if they consolidate into the Direct Loan program. Since *only* payments made after such consolidation count towards the 120 payments, it is important for FFEL Loan borrowers who might otherwise be eligible to consolidate into Direct Loans as early as possible.

18.     ACS representatives led borrowers to believe they were ineligible for the program when, in fact, they simply needed to consolidate into the Direct Loan program first.

19.     PSLF was mentioned nowhere on ACS's website. Notably, the page that purported to list repayment plan options for struggling borrowers did not identify PSLF as an option. Further, ACS managers directed representatives *not* to provide information on PSLF

eligibility criteria to borrowers who contacted ACS seeking information about the program. ACS customer service representatives were told to tell borrowers instead that PSLF "is only available for [Direct] loans…Your loan was disbursed under [FFEL] and therefore is not eligible for PSLF." Records of communications with borrowers indicate that ACS representatives told borrowers who asked about the program that their loans did not qualify for PSLF, without further explanation. These representatives sometimes referred borrowers to the U.S. Department of Education.

20.     These misrepresentations as to the availability of PSLF had particular effect on those borrowers who were members of the U.S. Armed Forces and therefore almost certainly were employed by a qualifying public-service employer. While ACS created a "Servicemembers" page designed to provide information to borrowers who are current members of the U.S. Armed Forces about the various options and benefits available to them, it made no mention of PSLF.

21.     ACS therefore failed to adequately inform borrowers as to their eligibility for PSLF. This harmed borrowers by preventing them from applying to a program that could lead to forgiveness of significant loan balances. Even if a borrower ultimately learned in some other way that the borrower could consolidate their FFEL Loans into Direct Loans to take advantage of PSLF, no payments made before the consolidation will count towards the 120 required payments, effectively forcing the borrower to "start over."

*Failing to Process Loan Verification Certificates*

22.     Before a borrower's existing FFEL Loans can be consolidated into a Direct Loan, the borrower's loan servicer must complete a Loan Verification Certificate ("LVC") concerning the terms of the existing loans.

23.     For years, ACS improperly calculated certain figures relating to Department of

Education subsidies for individual borrowers, raising a risk that it would provide the Direct Loan program with inaccurate financial information in LVCs.

24.     In 2014, ACS self-identified a population of loans that required remediation because they were impacted by this problem. While ACS was remediating this population, it ceased processing LVCs for borrowers with loans impacted by the remediation for over a year while trying to solve the problem systemically, even though it could have corrected individual borrowers' records on request.[1] This greatly delayed certain borrowers attempting to consolidate into the Direct Loan program.

25.     ACS's failure to process LVCs caused borrowers financial harm by delaying them from: (i) obtaining a lower monthly payment under PAYE or REPAYE; and (ii) making payments that count toward loan forgiveness under the PSLF program.

***Failing to Process IBR Applications and Recertifications in a Timely and Accurate Fashion***

26.     Borrowers who wish to enter and remain in an IBR plan are required to apply each year to verify their incomes and household sizes.

27.     ACS repeatedly failed to process IBR applications in a timely manner. ACS routed certain IBR applications to representatives working at offshore locations. Those representatives lacked access to the National Student Loan Data System ("NSLDS"), a database that must be used when processing married borrowers' IBR applications. When an NSLDS lookup is required, ACS's offshore agent transfers the application to one of ACS's onshore locations for the NSLDS lookup. After the NSLDS search is done, the onshore agent transfers the application to an offshore queue where a different offshore agent reviews the application.

---

[1] While the Department of Education may have directed ACS to stop issuing LVCs briefly in response to the problem, ACS continued to delay issuing them well after this period lapsed.

28.     ACS also repeatedly failed to accurately process IBR applications.  In 2014, one lender conducted an audit of ACS's handling of IBR applications and found that a high percentage of the reviewed applications were incorrectly rejected.  While ACS implemented quality testing to remediate the audit finding, ACS's quality testing procedures failed to address the root causes of processing errors.

29.     These practices unfairly harmed struggling borrowers by causing them to be excluded incorrectly or dropped from reduced payment plans under the IBR program, and by causing the capitalization of interest for borrowers who were dropped from the program.  Even those who were ultimately approved had to make payments higher than necessary before approval, and lost months towards IBR's 25-year forgiveness plan.

*Requiring Borrowers to Reapply for IBR after a Forbearance or Deferment*

30.     Federal regulations restrict the capitalization of interest on an IBR plan to when a borrower chooses to leave the IBR plan, or no longer qualifies for a reduced payment plan under IBR.  34 C.F.R. § 682.215(b)(5).  The U.S. Department of Education has explained that servicers may convert a borrower who has a reduced payment plan under IBR to a different payment plan, which results in capitalized interest, only in the following circumstances: (1) when the annual evaluation of the borrower's income and family size indicates that the borrower is no longer eligible for a reduced payment plan under IBR; (2) when the borrower fails to timely provide the required information that is necessary to annually recalculate the borrower's scheduled monthly payment; (3) when the borrower notifies the loan servicer that the borrower no longer chooses to make income-based payments; or (4) when the borrower requests to leave the IBR or Pay As You Earn repayment plan.  77 F.R. 66088, 66111 (Nov. 1, 2012, eff. July 1, 2013).  The "Income-Based Repayment Plan Implementation Guide," dated December 2013 and compiled by student loan servicers including ACS, indicates that, in 2013, the U.S. Department of Education

clarified that a borrower who is repaying under an IBR plan does not trigger the capitalization of unpaid accrued interest by then entering into a forbearance or deferment.

31. However, when a borrower with an IBR plan obtained a deferment or forbearance, ACS changed the borrower's payment plan, and required the borrower to reapply for IBR after the period of forbearance or deferment ended, even if time remained in the 12-month IBR period.

32. This practice harmed struggling borrowers by causing them to be dropped from IBR, resulting in higher monthly payments, capitalized interest, and a loss of the interest subsidy.

***Allocating Underpayments for Certain Borrowers to Maximize Late Fees***

33. When delinquent borrowers with multiple categories of loans make payments that are too low to bring their loan accounts current, ACS allocates those payments in a way designed to bring each group of loans "to the same level of delinquency."

34. For those borrowers for whom a late fee is charged for each delinquent loan group, this practice can cause borrowers to incur more late fees than is necessary.

35. Prior to December 2016, ACS also failed to clearly inform borrowers that they could request that ACS allocate an underpayment in a manner that would satisfy as many loans as possible, thereby minimizing the late fees incurred.

***Informing Delinquent Borrowers that They Are Required to Pay Both Any Delinquent Amount and the Present Month's Payment Immediately***

36. As with many other forms of credit, student loan borrowers are ordinarily billed monthly, with any month's bill generated some time in advance of the actual due date. Borrowers incur late fees only if they do not make a payment within a certain number of days following the actual due date.

37. If a borrower misses one or more payments, the bill generated for the payment

coming due the next month will ordinarily list the delinquent amount as the "past amount due."

38.    The bill will also ordinarily list the upcoming payment due (*i.e.*, the payment required to be made by the due date) as the "current amount due."

39.    The bill will then add the past amount due, the current amount due, and any late fees to yield the "total amount due."

40.    For a period of time prior to November 2017, ACS billing statements stated "TOTAL DUE BY: NOW" and listed the "total amount due" (not the "past amount due") next to it.

41.    If the borrower was more than 60 days delinquent on loan payments, the bill stated under the heading "IMPORTANT MESSAGE—PLEASE READ": "You must pay the total amount due, as shown above, immediately."

42.    However, the borrower was *not* actually required to pay the "total amount due" "now" or "immediately." The amount which the borrower was required to pay "now" or "immediately"—the amount actually due at the time of the generation of the bill—was only the "past amount due." The "current amount due" was not due and was not required to be paid until the actual due date that month.

43.    This billing practice harmed borrowers by deceptively inducing them to pay more than was actually due, at a time when they were already presumably struggling to make payments.

***Misapplying Borrowers' Payments***

44.    In servicing student loans, ACS uses so-called "packets." Each packet consists of loans issued to a single borrower from a single lender, and could contain loans with different interest rates, subsidies, and incentives.

45.    ACS's use of packets resulted in incorrect payment allocation among loans for

certain borrowers because ACS processed certain payments and manual transactions (*e.g.*, interest capitalization at the end of a forbearance) at the packet level, not the loan level. In a number of circumstances, ACS's system inaccurately calculated how certain payments and transactions affected the average daily balances of the loans within a packet when the loans had different interest rates, incentives, or subsidies.

46.     As a result, for years, ACS billed certain borrowers incorrect amounts and misrepresented the outstanding balances of borrowers' loans.

47.     In addition, ACS's records, including borrower complaints, indicate that ACS failed to credit payments to borrowers' loan accounts on a timely basis, and to follow special payment allocation instructions. These practices injured borrowers who were assessed late fees or had to spend time communicating with ACS to have it fix its mistakes.

***Reporting Incomplete and Erroneous Information to Credit Reporting Agencies***

48.     ACS repeatedly reported erroneous and incomplete information to credit reporting agencies. Such errors and omissions included but were not limited to (1) failing to accurately report the status of loans for borrowers in bankruptcy and post-bankruptcy; (2) failing to adjust balances to account for school refunds; (3) improperly including social security numbers in account number fields; (4) reporting invalid "pseudo" social security numbers in social security number fields; and (5) errors in reporting delinquencies, co-signers, and addresses.

49.     ACS identified these problems as early as 2010, yet did not begin to actively fix them for at least four years, and reporting errors persisted for years after. Throughout this time period, ACS received large volumes of disputes each month from consumers via the consumer reporting agencies' e-OSCAR web sites.

50.     These errors and omissions injured some borrowers by including incorrect information in their credit histories.

***Failing to Recalculate Monthly Payments when Adjusting the Interest Rate for
Servicemembers under the Servicemember Civil Relief Act***

51.     Under the Servicemember Civil Relief Act ("SCRA"), active-duty
servicemembers are entitled to pay no more than a 6% interest rate on their student loans.

52.     However, in limited circumstances, when ACS adjusted the interest rates on
servicemembers' student loans, it failed to also adjust the servicemembers' monthly payments.
As a result, from 2014 to 2017, ACS's billing statements directed a limited number of
servicemembers to make higher monthly payments than they were actually required to.

53.     This practice unfairly harmed and misled the affected servicemembers and
violated the SCRA.

***Charging Improper Late Fees***

54.     Federal regulations limit late fees on FFEL Loans to 6% of the past due amount.
*See* 34 C.F.R. § 682.202(e)(1).

55.     Under certain limited circumstances, ACS charged late fees to FFEL Loan
borrowers in excess of 6% of the past due amount.

56.     This practice unfairly harmed those borrowers and violated federal regulations by
requiring them to pay late fees they had not incurred.

***Failing to Notify Borrowers of their Eligibility for a Co-Signer Release***

57.     Many of the private student loans that ACS services include an incentive that
allows for the release of a borrower's co-signer after the borrower makes a certain number of
timely payments and meets other criteria.

58.     For several lenders, ACS fails to notify eligible borrowers that they can apply for
a co-signer release and only grants a co-signer release upon a borrower's request for the release.

59.     ACS's actions violated Exec. Law § 63(12), GBL § 349, SCRA, FSL §

408(a)(1)(A), the CFPA, and 34 CFR § 682.202(e)(1).

60.     ACS represents that, pursuant to an ongoing wind-down of its student-loan servicing operation initiated prior to the date of this Consent Order and the Assurance between Respondent and the NYAG, it has transferred all FFEL Loans and private loans it previously serviced to other servicers.  As of the date of the Consent Order and the Assurance, ACS has transferred the servicing of 100% of all FFEL Loans and 100% of all private loans.

61.     ACS neither admits nor denies DFS's and the NYAG's Findings in paragraphs 1-59 above.

62.     ACS has cooperated with DFS's investigation and with NYAG's investigation.

63.     ACS has agreed to this Consent Order and the Assurance in settlement of the violations above and to avoid the time, expense, and distraction of litigation.

64.     IT IS HEREBY UNDERSTOOD AND AGREED, by and between the parties:

**RELIEF**

65.     ACS represents that neither it nor any subsidiary, affiliate, or successor shall provide servicing for any student loans originated, guaranteed or insured by the federal government or pursuant to any federal law or for any private student loans for five years from the date of this Consent Order and the Assurance (the "No-Servicing Period").  For the avoidance of doubt, this restriction is not intended to apply to those third-party servicers now servicing student loans previously serviced by ACS, so long as they would not otherwise qualify as subsidiaries, affiliates, or successors.  In addition, this restriction is not intended to apply to ACS's servicing of Perkins Loans through ACS's Campus Products and Services division.  To the extent that, within the No-Servicing Period, ACS may enter into a third-party acquisition of an entity (including all subsidiaries and affiliates) that provides such servicing, ACS will notify DFS and the NYAG.  However, under those circumstances, ACS will not be in violation of this Consent

14

Order or the Assurance if ACS winds down or otherwise ends (e.g., by assignment of the servicing contract to other third-party servicers which do not otherwise qualify as subsidiaries, affiliates, or successors) the servicing provided by that entity with reasonable promptness. Unless DFS and the NYAG consent to the contrary, ACS must engage in the winding-down process even if it anticipates this process to extend beyond the No-Servicing Period.

66. Respondent shall pay to the State $1 million in penalties, payable to the "State of New York" as follows: $500,000 to DFS via electronic transfer in accordance with instructions provided by DFS; and $500,000 to the NYAG by wire transfer in accordance with instructions provided by the NYAG.

67. Payment of penalties shall be made in full upon execution of this Consent Order and the Assurance. ACS shall not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil penalties paid pursuant to this Consent Order and the Assurance.

68. Respondent shall also pay to borrowers $8 million in restitution in accordance with the terms of this Consent Order and the Assurance.

69. ACS shall use all reasonable efforts to identify borrowers determined by DFS and the NYAG, in their discretion, to be categorically eligible for restitution.

70. ACS shall hire an outside administrator (the "Administrator"), subject to the approval of DFS and the NYAG, to distribute restitution. The Administrator shall distribute restitution according to formulas determined by DFS and the NYAG. ACS shall be solely responsible for the cost of the Administrator and all costs associated with the restitution distribution process. ACS shall direct the Administrator to use all reasonable efforts, including use of Lexis or a similar service to determine the borrower's last known address, to mail a check

satisfying the amount of restitution determined by DFS and the NYAG to each borrower within six months of the effective date of this Consent Order and the Assurance. ACS shall direct the Administrator that if mail to a borrower is returned, the Administrator shall again attempt to determine the borrower's current address and send the check again.

71.     ACS shall deposit $3 million into a restitution fund held by the Administrator by February 1, 2019. ACS shall deposit $5 million into the restitution fund held by the Administrator by April 1, 2019.

72.     All borrowers who receive restitution shall also receive from the Administrator a statement accompanying the check to the effect that: (1) as the result of settlements with DFS and the NYAG concerning ACS's servicing of the borrower's loan, ACS is paying restitution to the borrower; (2) unless the borrower's loans have been completely paid off, the borrower should continue to make payments as before to the borrower's *current* servicer; (3) the borrower may seek further information on the settlement from DFS, including the website https://www.dfs.ny.gov, or the NYAG, including the website http://ag.ny.gov; and (4) the borrower may seek further information on income-driven repayment options which may reduce their monthly loan payments and Public Service Loan Forgiveness by visiting the U.S. Department of Education's website, https://studentaid.ed.gov.

73.     All restitution funds unclaimed by borrowers one year from the effective date of this Consent Order and the Assurance shall be divided equally between DFS and the NYAG, and paid in the same manner as the penalties described in paragraph 66 above.

74.     ACS shall direct the Administrator to provide a report to DFS and the NYAG within fourteen months of the effective date of this Consent Order and the Assurance listing the names and contact information of borrowers who received restitution and the amount each

borrower received.

75. ACS will cease and desist from engaging in any acts in violation of any applicable laws including Exec. Law § 63(12), GBL § 349, SCRA, FSL § 408(a)(1)(A), the CFPA, and 34 CFR § 682.202(e)(1) and will comply with all applicable laws.

## MISCELLANEOUS

76. ACS submits to the authority of the Superintendent of Financial Services of the State of New York (the "Superintendent") to effectuate this Consent Order.

77. ACS shall not take any action or make any statement denying, directly or indirectly, the propriety of this Consent Order or the Assurance or expressing the view that this Consent Order or the Assurance is without factual basis. However, nothing in this paragraph affects ACS's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings, investigations, or other government inquiries to which DFS, the NYAG, or any other agency or instrumentality of the State of New York, is not a party.

78. Any failure by DFS or the NYAG to insist upon the strict performance by ACS of any of the provisions of this Consent Order shall not be deemed a waiver of any of the provisions hereof, and DFS or the NYAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Consent Order and the Assurance to be performed by ACS.

79. All notices, reports, requests, and other communications pursuant to this Consent Order shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

    a. If to ACS, to: John C. Grugan, Esq. of Ballard Spahr LLP, 1735 Market Street 51st Floor, Philadelphia, PA 19103, or in his absence, to Eleanor Bradley

Huyett, Esq. of Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, PA 19103.

    b. If to DFS, to New York Department of Financial Services, Attn: Brian Montgomery, Deputy Superintendent, One State Street, New York, New York 10004-1511, or in his absence, Serwat Farooq, Assistant Counsel, One State Street, New York, New York 10004-1511.

80.    If DFS believes ACS to be in material breach of this Consent Order, DFS will provide written notice to ACS and it must, through counsel, within ten business days of receiving such notice, or on a later date if so determined in DFS's sole discretion, appear before DFS to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is immaterial or has been cured.

81.    ACS's failure to make the required showing within the designated time period as set forth in paragraph 80 of this Consent Order shall be presumptive evidence of ACS's material breach. Upon a finding by DFS that ACS has breached this Consent Order, DFS has all the remedies available to it under all applicable laws and may use any evidence available to it in connection with any ensuring hearings, notices, orders or other remedies that are available.

82.    DFS has agreed to the terms of this Consent Order based on, among other things, representations made to DFS by ACS, either directly or through counsel, and DFS's own factual investigation. To the extent that representations made by ACS are later found to be materially incomplete or inaccurate, this Consent Order is voidable by the Superintendent in her sole discretion.

83.    Upon DFS's request, ACS shall provide within a reasonable period of time all documentation and information reasonably necessary for DFS to verify compliance with

paragraphs 65-74 of this Consent Order.

84.     ACS represents and warrants, through the signature below, that the terms and conditions of this Consent Order are duly approved, and the execution of this Consent Order is duly authorized.

85.     This Consent Order and any dispute thereunder shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

86.     ACS waives its right to further notice and hearing in this matter as to any allegations of past violations up to and including the effective date of this Consent Order and agrees that no provision of this Consent Order is subject to review in any court or tribunal outside of DFS.

87.     This Consent Order is binding on the parties, as well as any successors and assigns. This Consent Order does not bind any federal or other state agency or any law enforcement authority.

88.     The Consent Order may not be altered, modified, or changed unless in writing signed by the parties hereto.

89.     The Consent Order shall be enforceable and remain in effect unless stayed or terminated in writing by the Superintendent or her designee.

90.     This Consent Order constitutes the entire agreement between DFS and ACS and supersedes any prior communication, understanding, or agreement, whether written or oral, concerning the subject matter of this Consent Order.

91.     No inducement, promise, understanding, condition, or warranty not set forth in this Consent Order has been relied upon by any party to this Consent Order.

92.     In the event that one or more provisions contained in this Consent Order shall for

any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Consent Order.

93.     Upon the parties' execution of this Consent Order, DFS will discontinue the investigation as to and against ACS solely with respect to the practices set forth herein through the effective date of this Consent Order. Provided that ACS fully complies with the terms of this Consent Order, no further action will be taken by DFS against ACS for the conduct set forth in this Consent Order that occurred between 2011 and 2017.

94.     Nothing in this Consent Order shall be construed to prevent any consumer from pursuing any right or remedy at law.

95.     The Superintendent acknowledges that ACS is simultaneously signing an Assurance with the NYAG regarding the subject matter of this Consent Order.

96.     This Consent Order may be executed in one or more counterparts, signed by each of the parties hereto and So Ordered by the Superintendent or her designee.

97.     The effective date of this Consent Order shall be January 4, 2019.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this ___ day of January, 2019.

CONDUENT EDUCATION SERVICES, LLC

By: _____
   Name:   J. Michael Peffer
   Title:   Vice President

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

By: _____
   MARIA T. VULLO
   Superintendent of Financial Services

By: _____
   NANCY I. RUSKIN
   Executive Deputy Superintendent
   Financial Frauds and Consumer Protection Division

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this ⁴day

of January, 2019.

CONDUENT EDUCATION SERVICES, LLC

By:_____
    Name:   _____
    Title:    _____

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

By:_____
    MARIA T. VULLO
    Superintendent of Financial Services

By: _____
    NANCY I. RUSKIN
    Executive Deputy Superintendent
    Financial Frauds and Consumer Protection Division