UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEFFREY CHERY, on behalf of
himself and all others similarly
situated,

                Plaintiff,

          -v-                  1:18-CV-75

CONDUENT EDUCATION
SERVICES, LLC, formerly
known as ACS, ACCESS
GROUP, INC., and ACCESS
FUNDING 2015-1, LLC,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:               OF COUNSEL:

MOORE KUEHN, PLLC        JUSTIN A. KUEHN, ESQ.
Attorneys for Plaintiff
30 Wall Street, 8th Floor
New York, NY 10005

BRAGAR EAGEL & SQUIRE, P.C.   LAWRENCE P. EAGEL, ESQ.
Attorneys for Plaintiff
810 Seventh Avenue, Suite 620
New York, NY 10019

BALLARD, SPAHR LAW FIRM    JOHN GRUGAN, ESQ.
Attorneys for Defendants        DANIEL C. FANASELLE, ESQ.
1735 Market Street, 51st Floor   ELIZABETH SEIDLIN-
Philadelphia, PA 19103           BERNSTEIN, ESQ.
                              THOMAS BURKE, ESQ.

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On January 18, 2018, named plaintiff Jeffrey Chery ("Chery") filed this

class action against defendants Conduent Education Services, LLC

("Conduent"), Access Group, Inc. ("Access Group"), and Access Funding

2015-1, LLC ("Access Funding") (collectively "Conduent"), three entities that

held or serviced Federal Family Education Loan Program ("FFELP") loans.

Chery alleged that Conduent interfered with borrowers' rights to prepay

or consolidate their FFELP loans in accordance with guarantees set out in

the loan agreements and federal law.  The complaint asserted six claims: (1) a

violation of New York General Business Law § 349; (2) a breach of contract;

(3) a breach of the implied covenant of good faith and fair dealing; (4) a

request for a declaratory judgment; (5) negligence; and (6) unjust

enrichment.  Dkt. No. 19.

On April 24, 2018, Conduent moved to dismiss Chery's complaint.  Dkt.

No. 20.  That motion was denied.  *Chery v. Conduent Educ. Servs., LLC*

("*Chery I*"), 2019 WL 1427140 (N.D.N.Y. Mar. 29, 2019).  Thereafter, the

parties engaged in some contested discovery before U.S. Magistrate Judge

Christian F. Hummel.  Dkt. No. 60; *Chery v. Conduent Educ. Servs., LLC* ("*Chery II*"), 2020 WL 4783167 (N.D.N.Y. Aug. 18, 2020) (Hummel, M.J.).

On January 15, 2021, Chery moved under Federal Rule of Civil Procedure ("Rule") 23 to certify a class of student loan borrowers whose right to prepay their FFELP loans was thwarted because Conduent failed to provide them with a timely Loan Verification Certificate ("LVC").  Dkt. No. 79.

On May 5, 2021, Chery's motion for class certification was granted over Conduent's opposition.  *Chery v. Conduent Educ. Servs., LLC* ("*Chery III*"), 2021 WL 1791756 (N.D.N.Y.).  The Court appointed Chery as representative and certified the following Class:

> All student loan borrowers who submitted an application to consolidate one or more FFELP Loans into a Direct Consolidated Loan between January 18, 2012, and the date of the Order certifying the Class, for which Defendants failed to provide an LVC within ten days of receiving the request therefor.

*Chery III*, 2021 WL 1791756, at *3.  Conduent sought leave to take an immediate[1] appeal, but was denied permission by the U.S. Court of Appeals for the Second Circuit in a mandate issued on July 26, 2021.  Dkt. No. 87.

On August 13, 2021, the parties cross-moved under Rule 56 for summary judgment.  Chery's motion seeks a judgment in favor of the Class on the

---

[1]  Rule 23(f) grants the court of appeals discretion to consider an interlocutory appeal from a class-certification order.  *See, e.g.*, *Microsoft v. Baker*, 137 S. Ct. 1702, 1709 (2017).

General Business Law § 349 ("Section 349") claim.  Dkt. No. 91.  Conduent, on the other hand, seeks a judgment dismissing the class action in its entirety.  Dkt. No. 92.  Conduent has also moved to preclude Chery's expert on damages.  Dkt. No. 93.  These motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  **BACKGROUND**

Each Class member took out one or more FFELP loans.  Pl.'s Facts, Dkt. No. 91-2 ¶ 2.  Although some of these loans were eventually transferred to a different loan servicer, it is undisputed that Conduent serviced each Class members' loan for at least some portion of time between January 18, 2012, and May 5, 2021 (the "Class period").[2]  *Id.* ¶ 3.  Each loan included a Master Promissory Note ("MPN").  *Id.* ¶ 4.  And each Class member received a form disclosure statement ("Disclosure Statement").[3]  *Id.*

The MPN and Disclosure Statement were materially the same for all members of the Class.  Pl.'s Facts ¶ 5.  As relevant here, these documents provided that: (a) a borrower may prepay all or any part of the unpaid balance on their loans at any time without penalty; (b) the loan is subject to

---

[2]  Conduent ceased servicing FFELP loans as of October 1, 2018.  Defs.' Facts, Dkt. No. 95-1 ¶ 1.

[3]  Chery refers to these two documents together as the "Contract," but Conduent denies that these were "contractual document[s]" or that the Disclosure Statement constitutes part of any contract.  *Compare, e.g.*, Pl.'s Facts ¶ 4, *with, e.g.*, Defs.' Resp. to Pl.'s Facts, Dkt. No. 94-2 ¶ 4.  The Court will take up the genuineness of that dispute *infra*.

the Higher Education Act of 1965, as amended (20 U.S.C. § 1070, et seq.), and applicable U.S. Department of Education regulations; and (c) repayment obligations are interpreted according to Federal Law (20 U.S.C. § 1071 to 1087–4) and Regulations (34 C.F.R. § 682), applicable state law and regulations governing the Federal Family Education Loan Program and the terms of the MPN. *Id.* ¶ 6.

Each Class member sought to either pay off their loans or to consolidate them into a federal Direct Consolidation Loan. Pl.'s Facts ¶ 25. When a borrower applies for consolidation under that particular loan program, the Secretary of Education sends the borrower's current servicer a request for an LVC. 34 C.F.R. § 685.220(f)(1)(i); Defs.' Facts ¶¶ 15–16 (explaining that four companies are authorized to service Direct Loans).

The LVC provides information that is necessary to complete the loan consolidation process. Pl.'s Facts ¶ 25. As relevant here, the loan servicer "must complete and return the Secretary's request for certification of the amount owed within 10 business days of receipt" or else "provide to the Secretary a written explanation of the reasons for its inability to provide the certification." § 685.220(f)(1)(i).

In January of 2019, Conduent entered into a Consent Order with the New York State Department of Financial Services ("DFS"). *Id.* ¶ 7. A few months later, on April 26, 2019, Conduent entered into a Consent Order with the

Consumer Financial Protection Bureau ("CFPB"). *Id.* ¶ 8. According to the findings in the CFPB's Consent Order, Conduent failed to return timely LVCs in at least 3,680 instances (as of 2015). *Id.* ¶ 9. Likewise, the DFS's Consent Order found that "[Conduent's] failure to process LVCs caused borrowers financial harm." Defs.' Resp. to Pl.'s Facts ¶ 10. Both Consent Orders include language expressly preserving the rights of individual borrowers to bring actions against Conduent. *Id.* ¶ 11.

Conduent has produced in discovery a spreadsheet (the "Class Data") that lists "all loan packets for which Conduent received an LVC request from a different servicer and did not return an LVC within 10 business days of receiving the request." Defs.' Resp. to Pl.'s Facts ¶ 26. This Class Data identifies the number of borrowers in the Class, the number of student loans associated with each borrower, and details, for each loan, the: (1) dates each LVC request was received and responded to; (2) information reported on the LVC responses; (3) payment status and, if relevant, the borrower's repayment plan before consolidation; and (4) other available information regarding consolidation. Pl.'s Facts ¶ 27.

The Class Data shows that Conduent routinely failed to return timely LVCs during the Class Period. Defs.' Resp. to Pl.'s Facts ¶ 28; *see also* Pl.'s Facts ¶¶ 14–24. The Class Data also shows that Conduent's delay affected 7,394 loan packets and resulted in an average delay of 173 days. Defs.' Resp.

to Pl.'s Facts ¶ 29.  According to William Jeffers, a Chartered Financial

Analyst retained by Chery as an expert on damages, the Class suffered

$3,344,568 as a result of this delay.  Pl.'s Facts ¶ 32.[4]

## III.  **LEGAL STANDARD**

The entry of summary judgment is warranted "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is

material for purposes of this inquiry if it "might affect the outcome of the suit

under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  And a dispute of material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether there are any genuine disputes of material fact, "a

court must resolve any ambiguities and draw all inferences from the facts in

a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F.

Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is

inappropriate where a "review of the record reveals sufficient evidence for a

rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of

Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

---

[4] Conduent denies that Chery's expert is qualified to make this calculation.  Defs.' Resp. to Pl.'s
Facts ¶ 32.  Conduent has moved to preclude Jeffers as an expert.  That motion is addressed *infra*.

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Cayuga Nation v. Tanner*, 448 F. Supp. 3d 271, 233 (N.D.N.Y. 2020) (cleaned up).  "In undertaking this analysis, it bears nothing that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*

## IV.  <u>DISCUSSION</u>

Chery contends summary judgment is warranted in favor of the Class on the Section 349 claim because Conduent failed to provide timely LVCs "for the thousands of Class members who sought to prepay or consolidate their federal student loans."  Pl.'s Mem., Dkt. No. 91-1 at 5.[5]  As Chery explains, the DFS and CFPB Consent Orders demonstrate that Conduent "suffered extensive servicing failures" and "failed to correct its servicing problems." *Id.* at 6.  Rather than "compensate, or even notify borrowers," Chery contends that Conduent "continued to operate under the guise that its system was functioning properly" even though "it knew for years that was not the case." *Id.*

---

[5]  Pagination corresponds with CM/ECF.

Conduent, on the other hand, argues that the whole class action should be dismissed because "Chery has produced no evidence that he was misled by Defendants, that Defendants breached any contract or duty to him, or that he was harmed—financially or otherwise—by the LVC delay."  Defs.' Mem., Dkt. No. 92-1 at 7.  According to Conduent, "although it is undisputed that a delay in LVC processing occurred, the undisputed facts show that Chery's claims as to liability and damages cannot succeed as a matter of law."  *Id*. at 10.  And because Chery is the class representative, this failure of proof on his claims is fatal to the Class members' claims as well.  *Id*. at 7.

## A.  The One-Way Intervention Rule

As an initial matter, however, Conduent contends that the Court should reserve decision on Chery's motion for partial summary judgment on the Section 349 claim until after Class notice has been distributed and the Class opt-out period has expired.  Defs.' Opp'n, Dkt. No. 94-1 at 17.  As Conduent explains, the so-called "one-way intervention rule" ordinarily requires courts to delay adjudicating the merits of a class claim until after these events.  *Id*.

As the Seventh Circuit has explained, "[t]he rule against one-way intervention prevents plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim."  *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057 (7th Cir. 2016).  In other words:

> [i]f an individual plaintiff were to get a favorable
> ruling on the merits prior to certification—and its
> corresponding notice and opportunity to opt out—then
> class members are incentivized to remain in the
> lawsuit to take advantage of a favorable ruling.  If an
> individual plaintiff got an unfavorable ruling on the
> merits prior to class certification, class members are
> incentivized to opt out of the class to avoid application
> of the unfavorable ruling.

*Id.* at 1058.  Thus, in the mine run of class action suits, "[a]llowing class

members to decide whether or not to be bound by a judgment depending on

whether it is favorable or unfavorable is 'strikingly unfair' to the

defendant."  *Id.* (quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194,

1207 (7th Cir. 1971) (Stevens, J., dissenting)).

Upon review, this argument will be rejected.  Assuming for now that the

rule should otherwise apply, the Court concludes that Conduent has waived

its protections.  *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir.

1998) (recognizing court's discretion to consider summary judgment briefing

in advance of class certification); *Mendez v. The Radec Corp.*, 260 F.R.D. 38,

48 (W.D.N.Y. 2009) (concluding defendants can implicitly waive the rule's

protections by seeking judgment on the merits).

This is because, as Chery points out, Conduent itself sought from the

Magistrate Judge a schedule for the filing of dispositive motions shortly after

the Second Circuit refused to hear its interlocutory appeal from the Class

certification Order.  Dkt. No. 89.  If Conduent wanted to invoke the protection

of the one-way intervention rule, it should have promptly raised the outstanding notice and opt-out issues to this Court or to the Magistrate Judge. Instead of doing that, Conduent moved for affirmative relief and then buried its intervention objection in the final two pages of its opposition to Chery's own motion for partial dispositive relief. Defs.' Opp'n at 17–18.

Further, given that the Class involves at most only a few thousand borrowers (ascertained by the Class Data provided by Conduent) who have alleged harm over a closed-ended period of time and who stand to receive relatively meager individual sums, the likelihood of opt-outs are low and therefore the risk of prejudice to Conduent is minimal. Accordingly, this argument will be rejected.

## B. William Jeffers, CFA

Conduent has moved to preclude the opinions and testimony of William Jeffers, CFA, Chery's expert on damages. Defs.' Mem., Dkt. No. 93-1. In Conduent's view:

> Jeffers's opinion rests on the highly speculative theory that Defendants delayed each of the 3,326 class members from someday obtaining forgiveness of their loan balances under a long-term federal loan forgiveness program, despite the fact that no one— including Jeffers—has any idea whether each Class member is participating in, or even intends to participate in, such programs, nor can anyone possible know whether all Class members would ultimately qualify for loan forgiveness 10 to 25years from now.

*Id*. at 5.  According to Conduent, "Jeffers's speculative opinion should be precluded for lack of qualification, reliability, and fit." *Id*.

Chery responds that Conduent's "arguments for excluding Jeffers's testimony are predicated on misrepresenting Jeffers's methodology and the purpose and scope of Jeffers's testimony." Pl.'s Opp'n, Dkt. No. 96 at 7.  As Chery explains, he did not put Jeffers forward as an expert on student loans or the student loan system. *Id*. at 10.  Instead, Chery retained Jeffers as an expert to calculate damages "by comparing what happened and what would have happened absent the misconduct." *Id*. at 10, 12.  According to Chery, these calculations are not based on hypothetical losses but "were incurred when Defendants restricted borrowers' rights and unilaterally decided when and how borrower payments would be applied. *Id*. at 12.

Federal Rule of Evidence 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" provided that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case." FED. R. EVID. 702.

"The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 833 (2011). This role as gatekeeper requires a court to make three, related findings before permitting a person to testify as an expert: "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact." *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 415 (E.D.N.Y. 2013) (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 396–97 (2d Cir. 2005)).

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth a non-exhaustive list of factors that bear on the reliability aspect of this inquiry: "(1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "These factors do not constitute, however, a definitive checklist or test. Rather, [t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (citation omitted).

The flexibility contemplated by Rule 702 is particularly helpful when an expert's testimony does not rest on traditional scientific methods. "In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusion through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Davis*, 937 F. Supp. 2d at 412 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999)).

"Thus, the Daubert factors do not necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." *Davis*, 937 F. Supp. 2d at 412 (citation and internal quotation marks omitted).

Whether based on traditional science or specialized experience, Rule 702 further mandates that an expert "stay within the reasonable confines of [their] subject area, and [thus] cannot render expert opinion on an entirely different field or discipline." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994), *aff'd sub nom.*, *Lappe v. Honda Motor Co. Ltd. of Japan*, 101 F.3d 682 (2d Cir. 1996).

In other words, "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of their expertise, courts strike

the extraneous testimony, as the admission of an expert does not provide that individual with carte blanche to opine on every issue in the case." *Davis*, 937 F. Supp. 2d at 413.

As always, "[t]he proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *Valente*, 931 F. Supp. 2d at 415 (citation and internal quotation marks omitted).  Importantly, however, "[t]he Second Circuit has held that under the Federal Rules of Evidence, there is a general presumption of admissibility of evidence." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014) (citation and internal quotation marks omitted).

In other words, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note.  Thus, "[t]o the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010).

Ultimately, a trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be in essence "an apples and

oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009); *see also Davis*, 937 F. Supp. 2d at 412 ("Expert testimony must also be relevant under Rule 401 and must not be unfairly prejudicial under Rule 403.").

First, Conduent argues that Jeffers is not qualified to render his opinions because he lacks specialized experience in the "particularly complex niche industry" of "federal student loan lending." Defs.' Mem. at 16. This argument will be rejected. As Chery points out, Jeffers has not offered any opinions about "student loans or the student loan system." Pl.'s Opp'n at 10. Instead, Chery has offered Jeffers as an expert on damages based on the length and nature of the LVC delays reflected in the Class Data. *Id.* at 9–10. Because there is no indication that Jeffers plans to opine as to any particular "duties owed" or as to "whether certain actions constituted breach" under the student loan documents, this first argument will be rejected. *Id.* at 10.

Second, Conduent argues that Jeffers's opinion is not based on a sound methodology. Defs.' Mem. at 19. Although Conduent concedes that Jeffers's "mathematical calculations are relatively straightforward," it nevertheless contends that Jeffers has applied "no methodology whatsoever" to the question of "*why* the amounts paid by borrowers during the consolidation delay supposedly constitute actual damages." *Id.* at 19–20 (emphasis in original).

This argument will also be rejected.  Conduent's own expert has acknowledged that "the standard accepted methodology for the calculation of economic harm is to compare what would have happened absent the misconduct and what actually happened.  Pl.'s Mem. at 14.  As Chery explains, Jeffers relied on the Class Data to determine, *inter alia*, the amounts paid by borrowers that would have been collected by another servicer but for the failure to provide a timely LVC.  *Id*. at 14.  In other words, Jeffers has applied a standard, accepted methodology to calculate the harm to the Class.

Third and finally, Conduent argues that Jeffers's testimony and opinion "contradicts the evidence of record and is highly speculative."  Defs.' Mem. at 22.  In Conduent's view, Jeffers's opinion relies on the speculative notion "that all Class members should be treated as if they will someday obtain loan forgiveness."  *Id*. at 22.  According to Conduent, "[w]hether any Class member will obtain loan forgiveness is unknown and unknowable, at least for a period of many years."  *Id*.

This argument will also be rejected.  Jeffers's damages calculation does not hinge on the question of whether Chery—or any other Class member, for that matter—will ultimately receive forgiveness through a particular federal loan program at some future point in time.  Rather, Jeffers's opinion assigns a value to the harm suffered by Class members who applied to have their

loans consolidated but were prevented from doing so by Conduent's failure to return timely LVCs.

Of course, "[t]he flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). For the reasons explained *supra* and in Chery's brief in opposition, Jeffers's opinion and testimony do not fall into the "junk science" category. Accordingly, Conduent's motion to preclude will be denied.

### C. <u>Chery's Motion for summary Judgment</u>

Chery has moved for summary judgment on the Section 349 claim. Pl.'s Mem., Dkt. No. 91-1. According to Chery, the undisputed facts in the record establish that Conduent falsely represented to Class members that they could prepay or consolidate their FFELP loans at any time despite knowing that its loan servicing system could not process timely LVCs. *Id.* at 6–7. As a result of this misrepresentation, Class members were trapped in loans that did not qualify for certain loan forgiveness programs and paid money to Conduent that should have been paid to other loan servicers. *Id.* at 16.

Conduent responds that Chery cannot establish causation on this claim because neither he, nor any other Class member, has affirmatively stated "that they saw or were deceived by the allegedly deceptive statement at issue." Defs.' Opp'n, Dkt. No. 94-1 at 6. Even assuming Chery could

establish causation, Conduent further argues that no Class member was actually harmed because the delay in processing the LVCs amounts to a mere "bookkeeping construct, not a concrete or actual harm." *Id.* at 10.

Chery replies that Conduent's argument conflates "causation" with "reliance." Pl.'s Reply, Dkt. No. 101 at 6. As Chery explains, the latter is not necessary to recover on a Section 349 claim. *Id.* Chery goes on to argue that the harm in this case is "the immediate injury caused by LVC delay." *Id.* at 7. According to Chery, this processing delay is not just a "bookkeeping construct" but a real harm that caused payments to be applied to loans that do not qualify for certain forgiveness programs. *Id.* at 8–9.

Section 349 is "a broad consumer protection measure," *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28 (N.Y. 2000), that prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN BUS. LAW § 349(a). To establish a violation of Section 349, the plaintiff must prove the defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. 2012) (citation omitted).

Upon review, Chery has established the first element of this claim as a matter of law. Conduent cannot—and really does not—dispute that it engaged in "consumer-oriented conduct" within the broad meaning of the

statute.  Section 349 on its "face appl[ies] to virtually all economic activity, and [its] application has been correspondingly broad." *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 290 (N.Y. 1999) (footnote omitted).  As the New York Court of Appeals has emphasized, this element merely requires the plaintiff to demonstrate "that the acts or practices have a broad impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (N.Y. 1995).

That threshold requirement is met where the misconduct "potentially affect similarly situated consumers." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26–27.  As relevant here, the Class Data establishes that Conduent's wrongful conduct reached a broad group of "consumers of student loan servicing"; *i.e.*, a class of borrowers who are "similarly situated." *Cf. Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64–65 (2d Cir. 2010) (distinguishing private contractual disputes from "facts showing injury or potential injury to the public").

Chery has also established that Conduent acted in a materially misleading fashion.  "Whether an act is materially misleading is defined objectively and looks to whether the act is likely to mislead a reasonable consumer acting reasonably under the circumstances." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 197 (S.D.N.Y. 2018).

Conduent admits that the MPNs and Disclosure Statements were "materially the same" for all of the members of the Class. Defs.' Resp. to Pl.'s Facts ¶ 5. Conduent acknowledges being aware that its systems were unable to process LVCs in accordance with the ten-day requirement set forth in the federal regulations.[6] *Id.* ¶¶ 28–29. And Conduent concedes that Class members with outstanding balances on so-called "unadjusted loans" were issued billing statements that failed to match the real-time, "back end" financial records that were actually maintained by Conduent. *Id.* ¶ 15.

This conduct qualifies as "objectively deceptive and materially misleading" as a matter of law. *Reynolds v. Xerox Educ. Servs., Inc.*, 2014 WL 4437622, at *7 (N.D.N.Y. Sept. 9, 2014) (Kahn, J.) (footnote omitted) (finding this element satisfied where defendant failed to adhere to amortization schedule in loan disclosure statement and rejecting contention that sending corrected disclosures at a later time remedied the deception).

Further, Chery has established that these misrepresentations resulted in harms that are cognizable under Section 349. "[A] plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily

---

[6] For instance, Conduent asserts that it "self-disclosed" the need for a "large-scale remediation of accounts" to the U.S. Department of Education in 2014. Defs.' Opp'n at 15. These and other processing failures eventually led to the Consent Orders with DFS and the CFPB. *See, e.g.*, Defs.' Resp. to Pl.'s Facts ¶¶ 17–18.

pecuniary, harm." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26.  To that end, Section 349 includes a statutory damages provision that permits a plaintiff to recover "actual damages or fifty dollars, whichever is greater."  § 349(h).

As Chery explains in his opening brief, Conduent's long delays in providing LVCs left Class members "trapped in loans they sought to repay or consolidate, paid money to Conduent that should have been paid to a different servicer and could not make payments towards loan forgiveness programs."  Pl.'s Mem. at 16.

Although Conduent contends that "mere delay" is insufficient to prove harm, Defs.' Opp'n at 10, there is no apparent dispute that each Class member "took the affirmative step of completing a Direct Loan consolidation application" and that the delay caused by Conduent's inability to process timely LVCs caused loan payments made by Class members to be applied to the wrong loan(s).  Pl.'s Reply at 9.

That is enough to move the facts of this case beyond a mere error in a "bookkeeping construct" and into the territory of cognizable harm.  Although some bookkeeping errors could theoretically be remedied at any point before a borrower actually applied for Public Service Loan Forgiveness ("PSLF"), the program requires the borrower to have made 120 on-time payments under a *qualifying* loan program.  *See, e.g.*, *Winebarger v. Pa. Higher Educ. Assistance*

*Agency*, 411 F. Supp. 3d 1070, 1079 (C.D. Ca. 2019).  The FFELP loans that were held by Class members do not qualify; these loans must be consolidated into a Direct Loan in order to qualify toward forgiveness.[7]  *See id*.

In opposition to this undisputed showing, Conduent argues that Chery cannot establish causation because neither he, nor any other Class member, has affirmatively stated "that they saw or were deceived by the allegedly deceptive statement at issue."  Defs.' Opp'n at 6.  But as Chery correctly points out, "such a declaration goes to reliance, not causation."  Pl.'s Reply at 6.  And "reliance is not an element of a section 349 claim."  *Stutman*, 95 N.Y. 2d at 29.  Accordingly, Chery has established his entitlement to summary judgment on liability for the Section 349 claim.

Even so, Conduent argues that Chery has incorrectly measured damages on this claim.  First, Conduent contends that treble statutory damages are inappropriate because Chery has failed to establish that Conduent acted "willfully and knowingly."  Defs.' Opp'n at 15.  As Conduent explains, it "self-disclosed" the LVC processing backlog to the Department of Education, which set off the "large-scale remediation" process that eventually corrected the systemic accounting errors.  *Id*.

---

[7] *See also* Public Service Loan Forgiveness (PSLF), FEDERAL STUDENT AID, https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service (last visited Jan. 14, 2022).

Upon review, there is no genuine dispute of material fact over the question of whether Conduent acted willfully or knowingly.[8] "Although it is not necessary under the statute that a plaintiff establish the defendant's intent to defraud or mislead, proof of scienter permits the court to treble the damages up to $1,000." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26; *see also* § 349(h) (permitting court in its discretion to "increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section").

In reaching this conclusion, it bears emphasizing that neither party has worked too hard to develop this issue in either direction. *Compare* Pl.'s Mem. at 17, *with* Defs.' Opp'n at 15–16, *and* Pl.'s Reply at 12. However, this question can still be decided as a matter of law because, as discussed *supra*, there is no reasonable dispute that: (1) Conduent failed to provide timely LVCs to thousands of Class members; (2) Conduent knew doing so was a violation of the relevant regulations (as evidenced by, *inter alia*, the company's self-disclosure to the Department of Education); (3) this failure to process timely LVCs was not minor or incidental (as evidenced by the fact

---

[8] These mental states are phrased disjunctively in Section 349, but in the criminal law context they are typically treated as roughly equivalent. *See, e.g., Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 & n.9 (2007) (federal law); *People v. Rodriguez*, 144 N.Y.S.3d 535, 539–40 (Sup. Ct. 2021) (state law).

that a Class comprised of 3,000+ members waited an average of 173 days for
something that should have taken 10 days); and that (4) Conduent took
affirmative steps to conceal these widespread, systemic accounting failures
from student loan borrowers by sending them billing statements that did not
actually match the "back end" financial records maintained by Conduent.  In
short, if this behavior qualifies as a Section 349 violation it is certainly a
willful or knowing one.

Second, and in the alternative, Conduent contends that Chery's expert has
offered an erroneous calculation of damages.  Defs.' Opp'n at 13.  As
Conduent explains, Section 349 only permits a plaintiff to recover once "per
violation."  *Id*.  In Conduent's view, "the underlying conduct—the delay in
providing an LVC—occurred only once per borrower."  *Id*. at 14 (emphasis
omitted).  Thus, Conduent insists that Chery's calculation—which calculates
statutory damages in the amount of $50 per loan packet, per month of LVC
delay—violates the text of the statute.  *Id*. at 13.  According to Conduent, "the
appropriate statutory damages calculation would be $50 multiplied by the
number of Class members (3,326): $166,300."  *Id*. at 14.

Upon review, this argument will be rejected.  On one hand, there is some
force to Conduent's assertion that, for any single Class member who sought
to prepay or consolidate their loan(s), it was only obligated to process one
timely LVC.  Defs.' Opp'n at 13–14.  On the other hand, framing the violation

this way utterly fails to account for the fact that Conduent's processing delays were egregious—173 days on average—leaving borrowers to miss out on benefits that can be measured in monthly payments.

Chery has established that Class members did just not miss out on a single month of a qualifying payment (in the case of loan consolidation) but missed out on *many months* of benefits because of Conduent's inability to process a timely LVC. Thus, after considering the matter, the Court agrees that a Section 349 violation in this case occurred "every payment period for every loan packet delayed." Pl.'s Reply at 11.

As a final matter, Conduent contends that Chery has failed to establish the liability of the other named defendants. Defs.' Opp'n at 16. According to Conduent, Chery "cannot simply rely on a generic assertion" of vicarious liability to recover against Access Group and Access Funding. *Id.*

Of course, "[a] principal may be held liable for its agent's violations of N.Y. GBL § 349." *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 270 (E.D.N.Y. 2012). As Chery points out, Conduent's own filings in support of summary judgment claim that "Access Group . . . is a FFELP lender that entered into a contractual loan servicing agreement with Conduent between 2012 and 2018 to service FFELP loans owned by Access Group and Access Funding 2015-1, LLC, which is a securitized trust." Defs.' Facts, Dkt. No. 92-2 ¶ 2. Thus, absent some meaningful indication that Conduent's servicing

of the Class members' loans was outside the scope of its own admitted agency relationship with the Access Defendants, this argument must be rejected.

### D.  <u>Conduent's Motion for Summary Judgment</u>

Conduent has moved for summary judgment dismissing the operative complaint.  Defs.' Mem., Dkt. No. 92-1.  In Conduent's view, "Chery has produced no evidence that he was misled by Defendants, that Defendants breached any contract or duty to him, or that he was harmed—financially or otherwise—by the LVC delay."  *Id*. at 7.  And because Chery is the Class representative, the failure of proof on his individual claims is fatal to the Class members' claims as well.  *Id*.

In opposition, Chery contends that he and the Class are entitled to summary judgment on the Section 349 claim for the reasons set forth in his own partial motion for summary judgment.  Pl.'s Opp'n, Dkt. No. 95 at 5.  As to the remaining causes of action, Chery contends that there are genuine disputes over the material facts that make a trial necessary.  *Id*.  In Chery's view, the Disclosure Statement and the Department of Education's Remediation process raise questions of fact "regarding both direct and functional privity" on the breach of contract claim.  *Id*. at 6.  As for the negligence and unjust enrichment claims, Chery argues that the Department of Education's Remediation process also raises a fact question as to whether

Conduent assumed a duty of care (and then acted reasonably under it) toward the Class, whose money it collected and has not returned. *Id*.

Upon review, Conduent's motion will be denied. As an initial matter, Conduent relies heavily on the premise that the future prospect of eventual loan forgiveness is too speculative to demonstrate any cognizable harm, either to Chery or to the Class. Defs.' Mem. at 7–8. But that argument will be rejected for the reasons already discussed *supra*.

Further, although Conduent disputes the relevance of the loan documents—the MPN and the Disclosure Statement—and denies having any direct contractual relationship with the Class members, "New York law does allow privity to be imputed to an agent of the contracting party under certain narrow circumstances." *Kapsis v. Am. Home Mortg. Serv., Inc.*, 923 F. Supp. 2d 430, 451 (E.D.N.Y. 2013).

Chery's opposition memorandum demonstrates that under the unusual facts presented by this case there are genuine disputes regarding whether "functional privity" might have existed between Conduent and the Class members. Pl.'s Opp'n at 13–14. And questions about whether Conduent benefitted from the long LVC delays preclude summary judgment on the unjust enrichment claim. *Id*. at 15.

The same is true of Chery's negligence claim. As Conduent acknowledges, Chery's negligence claim went to discovery on the theory that "the Class

might be able to prove the existence of an assumed duty of care." Defs.' Mem. at 29.  Conduent now relies heavily on case law that rejects negligence claims brought against student loan servicers engaged in a run-of-the-mill servicing relationship with their borrowers.

However, "where there is evidence that a defendant's continued conduct either placed a plaintiff in a more vulnerable position or caused the plaintiff to detrimentally rely on the defendant, courts have found the question of duty to involve triable issues of fact." *Kloner v. United States*, 196 F. Supp. 3d 375, 387 (E.D.N.Y. 2016).  The unusual facts presented by this case give rise to a genuine dispute over whether Chery and the Class have threaded the needle on this exception.  Pl.'s Opp'n at 14–16.  Accordingly, Conduent's motion for summary judgment will be denied.

## V. <u>CONCLUSION</u>

Therefore, it is

ORDERED that

1.  Defendants' motion to exclude plaintiff's expert is DENIED;

2.  Defendants' motion for summary judgment is DENIED;

3.  Plaintiff's motion for summary judgment with regard to the New York General Business Law § 349 claim is GRANTED;

4.  The parties are directed to meet and confer within 30 days of the date of this Decision to determine whether a total settlement can be reached as to all of the causes of action;

5.  The parties are further directed to provide a status report to the Court within 60 days of the date of this Decision; and

6.  If no total settlement or global resolution of the claims can be reached, the Court will at that time (a) enter a judgment in favor of the Class as to liability on the New York General Business Law § 349 claim and (b) set a date certain for a trial on damages and any remaining causes of action if necessary.

IT IS SO ORDERED.

Dated:  January 20, 2022
        Utica, New York.

David N. Hurd
U.S. District Judge